1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| GREGORY KOIRO, | Case No. 2:12-cv-00725-RFB-GWF |
| Plaintiff, | |
| | **ORDER** |
| v. | |
| LAS VEGAS METROPOLITAN POLICE | Defendants' Motion for Summary Judgment |
| DEPARTMENT, *et al.*, | (ECF No. 52) |
| Defendants. | |

### I.  SUMMARY

Before the Court is a Motion for Summary Judgment (ECF No. 52) filed jointly by Defendants Christopher Catanese and Las Vegas Metropolitan Police Department ("LVMPD"). For the reasons stated in this opinion and for the reasons discussed at the hearing pertaining to this motion, which are incorporated herein by reference, the motion is granted in part and denied in part.

### II. BACKGROUND

The parties in this case disagree on many of the material facts. The following facts are undisputed: On October 30, 2010, Plaintiff Gregory Koiro attended a tailgate party and University of Nevada, Las Vegas ("UNLV") football game with a friend, Laura Carducci. Defs.'

Mot. Summ. J. Ex. A at 37, 43; Defs.' Mot. Summ. J. Ex. B at 42. Koiro and Carducci arrived at the tailgate party at approximately 4:00 p.m., watched the first half of the football game in the stadium, and left the stadium around 9:30 or 10:00 p.m. Defs.' Mot. Summ. J. Ex. A at 43, 49. From the time he arrived at the tailgate party until the time he left the football game, Koiro stated that he drank between six and eight beers. Id. at 46. Both Koiro and Carducci agreed that Carducci should drive Koiro's truck back to her house, where Koiro had left his dogs. Id. at 49-50. Once they arrived at Carducci's house, Koiro asked Carducci for his car keys so that he could drive home. Id. at 51. Carducci refused because she did not think Koiro should be driving. Id. The two began to argue and Koiro eventually raised his voice. Id. at 52; Defs.' Mot. Summ. J. Ex. B at 45-46. In tears, Carducci then called her friend and next-door neighbor, Kim Costarell, to come over and follow Carducci as she drove Koiro home in his truck. Id. at 46. When she received Carducci's call, Costarell was at home with her boyfriend, LVMPD Officer Catanese. Defs.' Mot. Summ. J. Ex. C at 18-20. Catanese, who was off-duty and wearing plain clothes, accompanied Costarell over to Carducci's house. Defs.' Mot. Summ. J. Ex. D at 34-35. As they approached, Costarell and Catanese could hear yelling from inside the house as Koiro and Carducci continued to argue over the keys. Id. at 36-37. Koiro snatched the keys out of Carducci's hand, pushing into her as he did so; it is disputed whether Koiro intentionally pushed her with his hands or whether it was the result of grabbing at the keys. See id. at 74-75; Defs.' Mot. Summ. J. Ex. A at 54. Costarell and Catanese rang or knocked at Carducci's front door, at which point Koiro opened the door and walked past them to go to his truck. Defs.' Mot. Summ. J. Ex. D at 39-41. At this point, the parties have very different accounts of what transpired.

Koiro alleges that as he walked to his truck with his dogs, a man he did not recognize (Officer Catanese) confronted him aggressively, using profanity and threatening to beat Koiro unless he handed over his keys. Defs.' Mot. Summ. J. Ex. A at 61-66. Koiro did not hear or see anything to indicate that Catanese was a police officer. Id. at 63, 96, 98. Koiro walked past Catanese and put his dogs in the truck, opening the driver's side door to let them in. Id. at 63. Koiro then started to shut the driver's side door, but Catanese, who was following and standing close to Koiro, shut it for him. Id. at 65. Koiro states that Catanese continued to yell at him and

so Koiro started to walk away from him. Id. at 71. Koiro began walking around the truck and Catanese followed, continuing to demand that Koiro hand over his keys and nudging and pushing Koiro in the back. Id. at 72. As Koiro walked around the front of the truck, Catanese pushed him from behind into a row of bushes, then jumped on top of him and began punching him in the sides, stomach and back of the head. Id. at 71-74. At this point, Koiro states that the truck keys went flying out of his hand and Carducci picked them up. Id. at 75. After eight to ten blows from Catanese, Koiro was able to roll out of the bushes. Id. Over the next fifteen to twenty minutes, the two men wrestled and fought in the yard, during which time Catanese twice placed Koiro in a choke hold and once asked Costarell to come over and assist him by choking Koiro. Id. at 76-86. Koiro states that he bit Catanese twice out of desperation to get him to release his chokehold. Id. at 86-88. Eventually, Catanese yelled to Costarell to get his handcuffs. Id. at 89. Before the police arrived, Koiro claims that Catanese took Koiro's finger and bit it in retaliation for Koiro biting him twice. Id. at 89-90. Officers arrived and arrested Koiro, who alleges that he suffered a swollen and stiff neck, swollen wrists, various cuts and bruises, and an infection from the bite wound. Id. at 94, 104.

In response, Officer Catanese claims that Carducci was hysterical and extremely upset on the phone when she called Costarell. Defs.' Mot. Summ. J. at 4. Upon approaching Carducci's house, he alleges that as he looked through the front window, he saw two pairs of feet and saw the smaller pair stumble backward as if pushed. Defs.' Mot. Summ. J. Ex. D at 74-75. As Koiro walked past him to go to his truck, Catanese avers that he smelled alcohol emanating from Koiro and that he heard Carducci tearfully state that Koiro was going to drive home drunk. Id. at 39, 41-42. Catanese then approached Koiro, offering him a ride home and saying things like "I can't let you drive" and "I'm a Metro police officer, you don't want to do this." Id. at 44. Koiro ignored Catanese and attempted to open the driver's door to get in the car. Id. at 45, 47-48. Catanese claims that he then put his hand against the door and said "I can't let you drive." Id. at 48. Koiro turned toward Catanese, and Catanese saw something metal in his hands, which he assumed to be the keys. Id. at 49. Catanese reacted by grabbing Koiro's hand and shoulder, and the two fell into the bushes. Id. Catanese again tried to talk to Koiro, identifying himself as a

police officer and telling Koiro that he should let them drive him home. Id. at 51. Koiro then lunged toward Catanese and bit him in the face, clamping his teeth down on Catanese's cheek; Catanese grabbed and twisted Koiro's finger to get him to release the bite. Id. at 51-53. Koiro then stood up, grabbed Catanese's arm and fell back. Id. at 53-54. Catanese braced himself so as not to fall over, and he states that Koiro's weight pulling down on his arm caused Catanese to suffer a dislocated shoulder. Id. at 54, 77. In the fight that ensued, Catanese states that Koiro was the aggressor, punching and scratching Catanese as the officer tried to block the attacks. Id. at 55-57. Catanese became desperate and called for Costarell to help him; she came over and pulled Koiro away by the shoulder. Id. at 57-58. In an attempt to subdue Koiro, Catanese states that he then wrapped his arm around Koiro's neck using a lateral neck restraint technique in which he was trained. Id. at 59-60, 17-21. Koiro clawed at Catanese's face and bit him in the arms repeatedly, causing Catanese to let go. Id. at 61. Catanese eventually was able to pin Koiro against a wall until police arrived. Id. at 65-66. Catanese suffered a dislocated shoulder which required surgery, as well as bite marks to his face and arms and various scratches and gouges. Id. at 77.

After the incident, Koiro was charged with Battery With Substantial Bodily Harm (for the injuries inflicted on Officer Catanese), Battery-Domestic Violence (for allegedly pushing Carducci in the house), and Excrement (for biting Catanese). Defs.' Mot. Summ. J. Ex. K. Koiro eventually pled guilty to one count of misdemeanor battery and one count of disturbing the peace. Defs.' Mot. Summ. J. at 8.

On March 29, 2012, Koiro brought this action in state court against Officer Catanese and the Las Vegas Metropolitan Police Department, alleging negligence, negligent supervision, intentional infliction of emotional distress, battery, and a claim under 42 U.S.C. § 1983 for violation of his constitutional rights. Against both parties, Koiro claimed compensatory, special and punitive damages. Defendants removed the action to this Court. See ECF No. 1.

At the motion to dismiss stage, the Court dismissed Koiro's § 1983 claim against Catanese in his official (but not personal) capacity as duplicative of the municipal liability claims against LVMPD. The Court also dismissed the negligent supervision claim against LVMPD on

1    the ground that LVMPD is immune from tort liability for its discretionary acts pursuant to

2    Nevada Revised Statute § 41.032. However, the Court upheld Koiro's remaining § 1983 claims

3    as not barred by Heck v. Humphrey, 512 U.S. 477 (1994), upheld Koiro's § 1983 municipal

4    liability claim against LVMPD under Monell v. Dept. of Social Servs. of City of New York, 436

5    U.S. 658 (1978), denied Defendants' argument that Koiro did not allege that Catanese was acting

6    under color of state law for purposes of § 1983, and upheld Koiro's state tort claims against

7    LVMPD on a *respondeat superior* theory. See ECF No. 43.

8          In support of their briefs relating to the motion for summary judgment, the parties

9    submitted depositions, photographs, police reports, and a voluntary statement given by Koiro to

10   detectives while he was awaiting arraignment. Four individuals were deposed: Koiro, Officer

11   Catanese, Laura Carducci, and Kim Costarell. Koiro's and Carducci's accounts largely

12   corroborate one another, as do those of Catanese and Costarell. Koiro and Carducci both testified

13   that Catanese pushed Koiro into the bushes and began punching him and that Catanese asked

14   Costarell to come over and choke Koiro. Catanese and Costarell, on the other hand, both testified

15   that Koiro was on top of Catanese in the bushes and that Catanese was simply trying to defend

16   himself from Koiro's punches and bites.

17   **III. LEGAL STANDARD**

18         Summary judgment is appropriate when the pleadings, depositions, answers to

19   interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no

20   genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

21   law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When

22   considering the propriety of summary judgment, the court views all facts and draws all

23   inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747

24   F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must

25   do more than simply show that there is some metaphysical doubt as to the material facts . . . .

26   Where the record taken as a whole could not lead a rational trier of fact to find for the

27   nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007)

28   (alteration in original) (internal quotation marks omitted).

## IV. ANALYSIS

### A. Koiro's § 1983 claim against Catanese

Defendants claim that they are entitled to summary judgment with respect to Koiro's § 1983 claims against Catanese because Catanese is protected by qualified immunity. They argue first that Catanese did not violate any of Koiro's Fourth Amendment rights because Catanese had reasonable suspicion to stop and detain Koiro and because the force he used in detaining Koiro was objectively reasonable under the standard set out in Graham v. Connor, 490 U.S. 386 (1989). They argue that, viewing the totality of the circumstances as known to a reasonable officer in Catanese's position, Catanese acted "defensive[ly] and reactive[ly]" to Koiro's initiation of physical contact, and that Koiro's allegation that Catanese initiated the fight is contradicted by the evidence of Catanese's injuries and the criminal charges brought against Koiro and resulting conviction. Second, Defendants argue that even if Catanese violated the Fourth Amendment, he should still receive qualified immunity because Koiro did not carry his burden of showing that the right violated was clearly established.

Koiro responds that Catanese violated his Fourth Amendment right against unreasonable seizure by initiating the altercation. Koiro alleges that Catanese failed to identify himself as a police officer and that, regardless of whether Koiro was fit to drive, Catanese acted unreasonably by pushing Koiro and punching him repeatedly from behind when Koiro had not made any effort to resist or evade arrest. According to Koiro, other reasonable alternatives were available to Catanese, including calling the police dispatcher to order officers to come prevent Koiro from driving away or pull him over as soon as he left. Koiro also contends that the right at issue—which he states as the right to be free from excessive force—was clearly established at the time of the incident.

"Qualified immunity protects government officials from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Chappell v. Mandeville, 706 F.3d 1052, 1056 (9th Cir. 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The doctrine "ensures that 'officers are on notice their conduct is unlawful' before being subjected to suit." Tarabochia v.

1   Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).

2   The qualified immunity inquiry has two prongs: "(1) whether, taken in the light most favorable

3   to the party asserting the injury, the facts alleged show the official's conduct violated a

4   constitutional right; and (2) if so, whether the right was clearly established in light of the specific

5   case." Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009) (citing Saucier v. Katz, 533 U.S. 194,

6   201 (2001)). While the two prongs will often be decided in order, courts have discretion to

7   decide which of the prongs should be addressed first according to the circumstances of the

8   individual case. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

9       In deciding a claim of qualified immunity where a genuine dispute of material fact exists,

10  the court accepts the version asserted by the non-moving party. See Bryan v. MacPherson, 630

11  F.3d 805, 823 (9th Cir. 2010); Coles v. Eagle, 704 F.3d 624, 629 (9th Cir. 2012) ("We must, in the

12  context of summary judgment, resolve this disputed factual issue in favor of [the non-moving

13  party and] draw all reasonable inferences in his favor . . . ."). Summary judgment must be denied

14  where a genuine issue of material fact exists that prevents a finding of qualified immunity.

15  Sandoval v. Las Vegas Metropolitan Police Dept., 756 F.3d 1154, 1160 (9th Cir. 2014).

16              *1. The Conduct Violated A Constitutional Right*

17      Where "[an] excessive force claim arises in the context of an arrest or investigatory stop

18  of a free citizen, it is most properly characterized as one invoking the protections of the Fourth

19  Amendment . . . ." Graham, 490 U.S. at 394. In determining whether a particular use of force

20  was unreasonable and thus in violation of the Fourth Amendment, courts must balance "the

21  nature and quality of the intrusion on the individual's Fourth Amendment interests" against the

22  government's countervailing interests. Id. (citation omitted). This reasonableness inquiry "is an

23  objective one: the question is whether the officers' actions are 'objectively reasonable' in light of

24  the facts and circumstances confronting them, without regard to their underlying intent or

25  motivation." Id. at 397. The objective reasonableness inquiry requires analysis of the totality of

26  the circumstances. The Graham court listed three specific factors to be considered: (1) the

27  severity of the crime at issue, (2) whether the suspect presents an immediate threat to the officer

28  or to public safety; and (3) whether the suspect is actively resisting or evading arrest. Id. at 396.

1     In applying the <u>Graham</u> test, the Ninth Circuit has stated that it is first necessary to
2 "assess the quantum of force used to arrest" the plaintiff, and then to weigh it against the
3 governmental interests at stake by considering a range of factors, including those listed in
4 <u>Graham</u>. <u>Davis v. City of Las Vegas</u>, 478 F.3d 1048, 1054 (9th Cir. 2007) (quotation omitted). In
5 the Ninth Circuit, the "most important <u>Graham</u> factor is whether the suspect posed an immediate
6 threat to the safety of the officers or others." <u>Mattos v. Agarano</u>, 661 F.3d 433, 441 (9th Cir.
7 2011) (internal quotations omitted). Courts are nevertheless free to consider other factors,
8 "whether or not listed in <u>Graham</u>." <u>Franklin v. Foxworth</u>, 31 F.3d 873, 876 (9th Cir. 1994). Other
9 factors that have previously been considered by the Ninth Circuit include whether the officer
10 warned the suspect prior to using force and whether the officer considered the existence of other
11 available methods of effecting an arrest. <u>Bryan</u>, 630 F.3d at 831.

12     In determining the quantum of force used, the Court finds that genuine disputes of
13 material fact exist as to what was said prior to the altercation in the driveway, which party
14 initiated the contact, and the level of force used. There is sufficient evidence, in the form of
15 Koiro's and Carducci's sworn depositions, to allow a reasonable juror to believe Koiro's version
16 of events. Thus, for the purposes of this motion the Court resolves these disputed factual issues
17 in favor of Koiro and holds that the quantum of force to be analyzed is that which is alleged by
18 Koiro: that Catanese pushed Koiro from behind without provocation or warning, punched him
19 repeatedly in the sides and back of the head, and placed him in a chokehold.  It is this level of
20 force that the Court must assess to determine whether it was objectively unreasonable and
21 whether the right to be protected against it was clearly established.

22     In this case, taking the facts in the light most favorable to Koiro, the force used by
23 Catanese was objectively unreasonable. First, the quantum of force was significant.  The Court
24 finds the following facts.  Koiro had his back turned to Catanese and was attempting to walk
25 away from a man he did not know. Catanese was aggressively demanding that Koiro turn over
26 his keys, making verbal threats, and bumping and pushing Koiro as Koiro tried to walk away.
27 Then, without warning, Catanese pushed Koiro from behind into the bushes and began punching
28 him in the stomach, sides and back of the head. Later on in the altercation, Catanese also choked

Koiro. Importantly, the fact that Koiro was not treated for any injuries does not necessarily mean that the force used was minimal. See Santos v. Gates, 287 F.3d 846, 855 (9th Cir. 2002) (stating that in an earlier case, the Court's "reasoning appears to have been that because the injuries were so minor, the force used must have been minor also. . . . Although such a form of deductive reasoning may be appropriate in some use-of-force cases, in others the intrusion may be substantial even though the injuries are minor.").

The Court also finds that upon consideration of the totality of the circumstances, including the factors identified in Graham and by the Ninth Circuit, any governmental interest that could justify the use of such force is outweighed by the severity of the intrusion upon Koiro's liberty. The Court considers several factors in turn.

a. Severity of the Crime

One factor that courts may consider in assessing the reasonableness of a particular use of force is "the severity of the crime at issue." Graham, 490 U.S. at 396. The Court acknowledges that driving under the influence of alcohol is a certainly a serious offense. However, there is no indication from the facts found by the Court that Koiro was actually engaged in that offense.

Resolving factual disputes in favor of the nonmoving party, the Court finds that Koiro did not enter his vehicle at any time, and that he opened the driver's side door and let his dogs into the truck. He or Catanese then closed the door. Koiro was in front of his truck at the time that Catanese used force against him.

Under Nevada law, a person is guilty of driving under the influence of alcohol if he drives or is in "actual physical control" of the vehicle. See Nev. Rev. Stat. Ann. § 484C.110(1)(c) (West 2014). Koiro did not drive his vehicle at any point, nor was he in "actual physical control" of the vehicle. The Supreme Court of Nevada has held that "actual physical control" means "existing or present bodily restraint, directing influence, domination, or regulation of the vehicle." Rogers v. State, 773 P.2d 1226, 1228 (Nev. 1989). This determination requires the weighing of several considerations, including:

> [W]here, and in what position, the person is found in the vehicle; whether the vehicle's engine is running or not; whether the occupant is awake or asleep; whether, if the person is apprehended

- 9 -

at night, the vehicle's lights are on; the location of the vehicle's keys; whether the person was trying to move the vehicle or moved the vehicle; whether the property on which the vehicle is located is public or private; and whether the person must, of necessity, have driven to the location where apprehended.

Id. Here, Koiro was not found in the vehicle at all, but rather standing in front of it. There is no indication that the truck's engine was running or that its lights were on. The keys were in Koiro's hand, not in the ignition or in the door. Koiro had not moved the truck, nor is there any evidence that he had attempted to move the truck at all. The truck was parked on a private driveway, and Koiro had driven there much earlier in the day before he began drinking. Finally, Koiro had already opened the driver's side door to let his dogs in, had closed the door or had it closed for him, and had moved away from the door. These facts indicate that Koiro was not in position of bodily restraint, directing influence, domination, or regulation of the vehicle. In Rogers, the Supreme Court of Nevada stated: "For example, if, after leaving a bar, a person under the influence flopped into the back seat of his vehicle, while the vehicle was yet in the bar's parking lot, and fell asleep *without starting or driving the vehicle,* the person would not, under [the precursor to § 484C.110], be in actual physical control of the vehicle." Id. at 1228 n.5 (emphasis added). The Court finds that the facts of this case do not support a determination that Koiro was in violation of Nevada law.

Therefore, Koiro had not committed the crime of driving under the influence at the time Catanese pushed him from behind and began punching him.  Additionally, Catanese did not observe Koiro engaged in any acts that would have indicated that Koiro had committed a crime. This factor therefore weighs in favor of Koiro.

### b. Immediate Threat of Harm to the Officer or Others

The most important factor in the objective reasonableness analysis is whether the individual posed an immediate threat to the safety of the officer or others. Graham, 490 U.S. at 396; Mattos, 661 F.3d at 441. In considering whether an immediate threat existed, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." Mattos, 661 F.3d at 441-42 (citation omitted) (internal quotation marks omitted). Viewing the facts in the light most favorable to

Koiro, the Court finds that there was no immediate threat to Catanese's safety. Koiro had not made any movements or statements toward Catanese that would indicate hostility or aggression. In fact, Koiro was walking away from Catanese at the time of the alleged use of force.

The Court also finds that there was no <u>immediate</u> threat posed to public safety by Koiro. While the active commission of the offense of driving while under the influence of alcohol would constitute an immediate threat to the public, the Court has found that Koiro was not driving under the influence of alcohol. The Court also finds that several additional facts, taken in the light most favorable to Koiro, militate against a conclusion that Koiro presented an immediate threat to public safety. First, Koiro was not next to the door of the truck at the time Catanese used force against him. Instead, Koiro was walking around the front of the truck attempting to get away from Catanese, who he claims was aggressively yelling at and pushing him. Second, Koiro had already opened the driver's side door to let his dogs in the truck. Once he or Catanese closed the door, Koiro did not attempt to open it again and get in the truck, but rather walked away from the door. Third, Koiro made no verbal indication that he intended to get in the truck and drive at the time he was pushed from behind by Catanese. Koiro did not ask or tell Catanese to get out of the way so that he could get in the truck, and he made no statements at all related to driving. The Court finds that the facts as alleged do not support a finding that Koiro posed an immediate threat to public safety. Thus, this factor cuts in favor of Koiro.

c. <u>Active Resistance or Flight</u>

Courts may also consider whether the individual was "actively resisting arrest or attempting to evade arrest by flight." <u>Graham</u>, 490 U.S. at 396. Taking the facts in the light most favorable to Koiro, the Court finds that at the time of the alleged use of force, Koiro was neither resisting nor attempting to evade arrest. Koiro states that Catanese did not at any point state or provide evidence that he was a police officer. Catanese did not state that Koiro was under arrest or that he would be subject to arrest if he did not obey Catanese's commands, nor did he order Koiro to stop and submit to questioning. Koiro took no actions that could be construed as resistance, and while he did walk away from Catanese, he did not know that Catanese was a police officer. Accordingly, this factor also weighs in Koiro's favor.

- 11 -

1

                d. <u>Consideration of Alternatives</u>

2

        Finally, in analyzing the objective reasonableness of a particular use of force, courts may

3 take into account whether the officer considered the existence of alternative tactics, if any, to

4 effect an arrest or detention. <u>Bryan</u>, 630 F.3d at 831. Here, the Court finds that there were clear

5 alternatives available to Catanese that did not involve the use of any force or the use of

6 significant force. These alternatives track the progression of the use of force continuum in which

7 Catanese acknowledges he was trained. Defs.' Mot. Summ. J. Ex. D at 16.

8

        According to Catanese, the first step along the continuum is "[o]fficer presence, which is

9 [the] officer standing there in uniform." <u>Id.</u> at 16-17. Catanese was off-duty at the time and thus

10 not in uniform. However, he nonetheless could have clearly identified himself to Koiro as a

11 Metro police officer, both verbally and by displaying his badge, which he acknowledges he was

12 carrying at the time. <u>Id.</u> at 68-69. The second step in the use of force continuum is "verbal

13 commands, which is telling somebody to do something." <u>Id.</u> at 17. Catanese could have verbally

14 commanded Koiro to stop walking and to submit to questioning pursuant to Catanese's authority

15 as a police officer. Catanese also could have informed Koiro that he would be subject to arrest if

16 he did not comply with these commands. The next step is the use of force "with no substantial

17 bodily harm." <u>Id.</u> If Koiro had not obeyed Catanese's verbal commands made pursuant to his

18 official authority, Catanese could have used some degree of force to detain Koiro short of

19 pushing him from behind and punching him in the sides, stomach and back of the head. It is not

20 until the fourth step in the continuum that officers are able to employ "takedowns . . . with

21 force," <u>id.</u>, which appears to be the level to which Catanese's use of force applies. The Court

22 finds that Catanese had clear alternatives in the form of intervention along the three lower levels

23 of the continuum of force and that, taking the facts in the light most favorable to Koiro, there is

24 no evidence that Catanese employed or considered these alternatives.

25

        In sum, the level of force and hence the level of intrusion on Koiro's Fourth Amendment

26 interests under these circumstances leads the Court to find that Catanese's use of force was

27 objectively unreasonable and in violation of the Fourth Amendment.

28

1
                        ***2. The Right Was Clearly Established***

2
       If the Court determines that the officer violated a constitutional right of the plaintiff, the

3
officer is nonetheless entitled to qualified immunity unless the plaintiff proves that the right

4
violated was clearly established at the time of the incident. <u>Tarabochia</u>, 766 F.3d at 1125 (citing

5
<u>Pearson</u>, 555 U.S. at 231-32).

6
       A right is "clearly established" if its "contours [are] sufficiently clear that a reasonable

7
official would understand" that her actions were in violation of that right. <u>Hope</u>, 536 U.S. at 739.

8
An officer's reasonable mistake as to the law does not destroy qualified immunity, as

9
government officials "must have 'fair warning' that their actions are unconstitutional." <u>Chappell</u>,

10
706 F.3d at 1056 (quoting <u>Hope</u>, 536 U.S. at 741). The district court looks to binding Supreme

11
Court and Ninth Circuit precedent as an initial matter to decide whether the right in question was

12
clearly established; however, the exact action at hand need not have been held unlawful. <u>Id.</u>

13
(citing <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)). Rather, the crucial inquiry is whether,

14
even in novel circumstances, "a reasonable officer would have had fair notice that [the action]

15
was unlawful." <u>Drummond ex rel. Drummond v. City of Anaheim</u>, 343 F.3d 1052, 1060 (9th Cir.

16
2003). Finally, the right must be defined at "the appropriate level of generality . . . [the court]

17
must not allow an overly generalized or excessively specific construction of the right to guide

18
[its] analysis." <u>Cunningham v. Gates</u>, 229 F.3d 1271, 1288 (9th Cir. 2000); <u>see also</u> <u>Ashcroft v.</u>

19
<u>al-Kidd</u>, 131 S.Ct. 2074, 2084 (2011) ("We have repeatedly told courts—and the Ninth Circuit in

20
particular—not to define clearly established law at a high level of generality.") (citation omitted).

21
       The Court finds that the right violated by Catanese was clearly established—a conclusion

22
that Defendants appear to concede in their briefing. <u>See</u> Defs.' Mot. Summ. J. at 18. According

23
to Koiro's allegations, Koiro was pushed and struck from behind while walking away from

24
Catanese. Prior to this incident, it was clearly established that an individual may not be subjected

25
to significant force when he has not resisted, or has merely engaged in passive resistance to, an

26
officer's commands. <u>Bryan</u>, 630 F.3d at 829-830; <u>see also</u> <u>Gravelet-Blondin v. Shelton</u>, 728 F.3d

27
1086, 1093 (9th Cir. 2013) ("The right to be free from the application of non-trivial force for

28
engaging in mere passive resistance was clearly established prior to 2008"); <u>Nelson v. City of</u>

Davis, 685 F.3d 867, 881-82 (9th Cir. 2012) (reviewing cases dating back to 2002 in which the Ninth Circuit has "recognized that a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force."). While there is no case with a factual scenario identical or nearly identical to that in this case, the Court nonetheless finds that the right Catanese violated was clearly established. The Ninth Circuit has "never required a prior case on all fours prohibiting that particular manifestation of unconstitutional conduct to find a right clearly established." Torres v. City of Madera, 648 F.3d 1119, 1129 (9th Cir. 2011) (citation omitted) (internal quotation marks omitted). It is enough that officers have "fair warning" that their conduct is unlawful. Hope, 536 U.S. at 741. Here, as Officer Catanese stated in his deposition, Defs.' Mot. Summ. J. Ex. D at 16-17, LVMPD officers are trained in the continuum of force and how it applies in a variety of situations. No reasonable officer could fail to understand that an unprovoked attack, as Koiro alleges, is unlawful. That is to say, it would be unreasonable for an officer to believe that he could push someone to the ground and start hitting that person in the sides and back of the head when that person had not resisted the officer, had not committed any crime in the officer's presence, and had not shown an unwillingness to submit to the authority of the officer.

Given that the Court views the facts in the light most favorable to Koiro at this juncture, the Court finds that Koiro's allegations sufficiently establish that Catanese's actions violated the Fourth Amendment. Further, the Court finds that as a matter of law, the actions alleged by Koiro—an unprovoked attack by a police officer, consisting of pushing or jumping on Koiro from behind, causing him to fall over, and repeatedly punching him in the sides, stomach and back of the head—violated a clearly established right. Catanese is therefore not entitled to qualified immunity for Koiro's § 1983 claim.

**B. Koiro's § 1983 Claim Against LVMPD**

Defendants next argue that LVMPD is exempt from § 1983 liability. Citing Monell v. Dept. of Social Servs. of City of New York, 436 U.S. 658, 694 (1978), they argue that in order to hold a municipality liable under § 1983, the plaintiff must allege that the injury occurred due to an act taken pursuant to an official policy or custom. Among other arguments, Defendants claim

1   that any evidence that Koiro has attempted to produce is inadmissible and insufficient to prove a

2   policy or custom and that Koiro has not presented any testimony or evidence showing how such

3   a policy or custom caused his injuries. They also argue that Koiro's evidence is inadmissible to

4   prove liability on a theory of deliberate indifference to the training and supervision of LVMPD

5   officers.

6        In his opposition, Koiro agreed to the dismissal of his § 1983 claim against Defendant

7   LVMPD. In their reply, Defendants accepted Koiro's dismissal of this claim.

8        "A party abandons an issue when it has a full and fair opportunity to ventilate its views

9   with respect to an issue and instead chooses a position that removes the issue from the case."

10  BankAmerica Pension Plan v. McMath, 206 F.3d 821, 826 (9th Cir. 2000). Accordingly, the court

11  grants summary judgment against Koiro on his § 1983 claim against LVMPD.

12        **C. Koiro's Intentional Infliction of Emotional Distress Claim**

13        Defendants also moved for summary judgment on Koiro's intentional infliction of

14  emotional distress (IIED) claim. Defendants argue that Koiro has presented no evidence

15  sufficient to satisfy either of the first two requirements of an IIED claim under Nevada law.

16        In response, Koiro agreed to the dismissal of his IIED claim against both Defendants,

17  which Defendants accepted. For the reasons stated above, this claim has been abandoned by

18  Koiro and summary judgment is granted in favor of Defendants on this claim.

19        **D. Koiro's Negligence and Battery Claims**

20        Finally, Defendants contend that Catanese is immune from suit on Koiro's state law

21  claims pursuant to Nevada's discretionary-act immunity statute.

22        NRS § 41.032 states, in relevant part:

23

24        [N]o action may be brought . . . against an immune contractor or
        an officer or employee of the State or any of its agencies or
25        political subdivisions which is:
        ***

26        2. Based upon the exercise or performance or the failure to
        exercise or perform a discretionary function or duty on the part of
27        the State or any of its agencies or political subdivisions or of any
        officer, employee or immune contractor of any of these, whether or
28        not the discretion involved is abused.

- 15 -

In <u>Martinez v. Maruszczak</u>, 168 P.3d 720 (Nev. 2007), the Supreme Court of Nevada adopted the <u>Berkovitz-Gaubert</u> test to evaluate discretionary-act immunity under NRS § 41.032. This two-part test originated with two U.S. Supreme Court decisions interpreting the Federal Tort Claims Act (FTCA), which mirrors NRS § 41.032(2). <u>See</u> <u>Berkovitz v. United States</u>, 486 U.S. 531 (1988); <u>United States v. Gaubert</u>, 499 U.S. 315 (1991).

Under this test as adopted by the Supreme Court of Nevada, a governmental act or decision is entitled to discretionary-act immunity if it (1) "involve[s] an element of individual judgment or choice and (2) [is] based on considerations of social, economic, or political policy." <u>Martinez</u>, 168 P.3d at 729. This type of immunity may protect even "frequent or routine decisions" at all levels of government, provided they "require analysis of government policy concerns." <u>Id</u>.

To clarify the standard, the Court stated that "immunity will likely attach under the second criterion" to actions that are integral to governmental planning or to the formulation of governmental policy, or if liability would disrupt the separation of powers or "jeopardize the quality of the governmental process." <u>Id</u>. As an example, the Court distinguished between "the decision to create and operate a public hospital," which is entitled to discretionary-act immunity, and "a [state] physician's diagnostic and treatment decisions," which do not receive immunity as they "generally do not include policy considerations." <u>Id</u>.

However, there are two limitations on discretionary-act immunity. First, immunity does not attach for actions taken in bad faith. <u>Falline v. GNLV Corp.</u>, 823 P.3d 888, 891 (Nev. 1991); <u>Davis</u>, 478 F.3d at 1059. In the context of an arrest involving allegedly excessive force, an officer's action may be in bad faith if motivated by "hostility toward a suspect or a particular class of suspects . . . or because of a willful or deliberate disregard for the rights of a particular citizen or citizens . . . ." <u>Davis</u>, 478 F.3d at 1060. Second, acts taken in violation of the Constitution cannot be considered discretionary. <u>Mirmehdi v. United States</u>, 689 F.3d 975, 984 (9th Cir. 2011); <u>Nurse v. United States</u>, 26 F.3d 996, 1002 (9th Cir. 2000).

1    The Court finds that Officer Catanese is not entitled to discretionary-act immunity
2    because his alleged actions violated the Constitution. "[I]n general, governmental conduct cannot
3    be discretionary if it violates a legal mandate." Nurse, 26 F.3d at 1002 (interpreting the FTCA's
4    discretionary function exception, which mirrors Nevada's discretionary-act immunity test). In
5    Mirmehdi, the Ninth Circuit held that the decision of the U.S. Attorney General to detain an
6    individual pending the outcome of immigration proceedings fell within the FTCA's discretionary
7    function exception because the plaintiffs failed to "allege that this decision itself violated the
8    Constitution." Mirmehdi, 689 F.3d at 984. In this case, by contrast, Koiro has alleged that
9    Catanese's use of force violated his constitutional rights. Accordingly, Catanese is denied
10   discretionary-act immunity on Koiro's claims.

## CONCLUSION

12   **IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment is
13   **DENIED** with respect to Count One, Plaintiff's negligence claim.

14   **IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment is
15   **GRANTED** with respect to Count Three, Plaintiff's intentional infliction of emotional distress
16   claim.

17   **IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment is
18   **DENIED** with respect to Count Four, Plaintiff's battery claim.

19   **IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment is
20   **GRANTED** with respect to Count Five, Plaintiff's claim for violation of 42 U.S.C. § 1983, as
21   alleged against Defendant Las Vegas Metropolitan Police Department only.

22   **IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment is
23   **DENIED** with respect to Count Five, Plaintiff's claim for violation of 42 U.S.C. § 1983, as
24   alleged against Defendant Catanese only.

25   DATED this 21st day of November, 2014.

26

27   _____
     **RICHARD F. BOULWARE, II**
28   **UNITED STATES DISTRICT JUDGE**